UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DWAYNE R. STEPHENSON,<br><br>     Plaintiff,<br><br>vs.<br><br>CORIZON MEDICAL SERVICES, DR.<br>YOUNG, NP POULSON, et al.,<br><br>     Defendants. | Case No. 1:15-cv-00559-DCN<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Pending before the Court are Plaintiff Dwayne R. Stephenson's Motion for

Issuance of Subpoena Duces Tecum (Dkt. 20) and Motion to Compel Disclosure (Dkt.

25), as well as Defendant Dr. Murray Young and Nurse Practitioner Poulson's Motion for

Summary Judgment. (Dkt. 23.) Having reviewed the record and having considered the

argument of the parties, the Court finds that oral argument is unnecessary and enters the

following Order.

## MOTION FOR SUMMARY JUDGMENT

### 1. Summary Judgment Standard of Law

Summary judgment is appropriate where a party can show that, as to a particular

claim or defense, "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal

purposes of the summary judgment rule "is to isolate and dispose of factually

unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which

factually insufficient claims or defenses [can] be isolated and prevented from going to

trial with the attendant unwarranted consumption of public and private resources." *Id*. at

327.

Rule 56(c) provides:

A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by:

(A) citing to particular parts of materials in the record, including depositions,
documents, electronically stored information, affidavits or declarations,
stipulations (including those made for purposes of the motion only),
admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a
genuine dispute, or that an adverse party cannot produce admissible evidence
to support the fact.

"[T]he mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment ...." *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, there must be a *genuine* dispute

as to a *material* fact essential to an important element of the cause of action or defense to

survive summary judgment. Disputes over facts that are not material to the resolution of

the motion will not preclude summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec.

Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The Court must consider "the cited materials," but it may also consider "other

materials in the record." Fed. R. Civ. P. 56(c)(3). The existence of a scintilla of evidence

in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact should be "presented in a form that would be admissible in evidence," or it may be subject to being stricken. *See* Fed. R. Civ. P. 56(c)(2).[1] Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). The Court may also grant summary judgment to a non-moving party, on a ground not raised by either party, or sua sponte provided that the parties are given notice and a reasonable opportunity to respond. Fed. R. Civ. P. 56(f).

---

[1] In determining admissibility for summary judgment purposes, it is the content of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the content of the evidence could be presented in an admissible form at trial, the content may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony would not be hearsay).

The Court does not decide credibility of affiants or weigh the evidence set forth by the non-moving party. *Anderson*, 477 U.S. at 255. That means a party's or witness's sworn statement must be taken as true for purposes of summary judgment. The Court must also draw all reasonable inferences from circumstantial evidence in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, but it is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1207-088 (9th Cir. 1988) (observing that *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574 (1986), "authorizes an inquiry on summary judgment into the 'implausibility' of inferences from circumstantial evidence …, not an inquiry into the credibility of direct evidence.").

### 2. Eighth Amendment Standard of Law

To state a claim under the Eighth Amendment, a plaintiff must show that he is incarcerated "under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard— deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

As to the objective standard, the Supreme Court has explained that, "[b]ecause society does not expect that prisoners will have unqualified access to health care,

deliberate indifference to medical needs amounts to an Eighth Amendment violation only

if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The United States Court of Appeals for the Ninth Circuit has defined a "serious

medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in
> further significant injury or the unnecessary and wanton
> infliction of pain; . . . [t]he existence of an injury that a
> reasonable doctor or patient would find important and worthy
> of comment or treatment; the presence of a medical condition
> that significantly affects an individual's daily activities; or the
> existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*,

*WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

As to the subjective factor, to violate the Eighth Amendment, a prison official

must act in a manner that amounts to deliberate indifference, which is "more than

ordinary lack of due care for the prisoner's interests or safety," but "something less than

acts or omissions for the very purpose of causing harm or with knowledge that harm will

result." *Farmer*, 511 U.S. at 835. Stated another way, deliberate indifference exists when

an "official knows of and disregards an excessive risk to inmate health or safety," which

means that an official "must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Id.* at 837.

Differences in judgment between an inmate and prison medical personnel

regarding appropriate medical diagnosis and treatment are not enough to establish a

deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989), *overruled in part on other grounds, Peralta v. Dillard*, 744 F.3d 1076, 1082-83 (9th Cir. 2014). Nor are differences among medical providers. *Snow*, 681 F.3d at 987. "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980). A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990). If the defendants are able to show that medical personnel have been "consistently responsive to [the inmate's] medical needs, and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," a plaintiff's claims may be dismissed by summary judgment prior to trial. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

The Eighth Amendment does not provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). A prison doctor's

recommendation for a less costly treatment is not deliberate indifference unless the recommendation "was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998).

In *Estelle v. Gamble, supra,* Inmate Gamble suffered a back injury at work when a 600-pound bale of hay fell on him. Doctors and other medical providers at the prison prescribed rest and a variety of medications, including different pain relievers and muscle relaxers. Gamble argued that the medical providers were deliberately indifferent because they should have done more to diagnosis his back problem, such as x-raying his back. The United States Supreme Court disagreed, reasoning:

> Gamble was seen by medical personnel on 17 occasions spanning a 3-month period: by Dr. Astone five times; by Dr. Gray twice; by Dr. Heaton three times; by an unidentified doctor and inmate nurse on the day of the injury; and by medical assistant Blunt six times. . . . The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. The Court of Appeals agreed, stating: "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." 516 F.2d, at 941. But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act. The Court of Appeals was in error in holding that the alleged insufficiency of the medical treatment required reversal and remand.

> That portion of the judgment of the District Court should have been affirmed.

429 U.S. at 97-98.

Similarly, in *Toguchi v. Chung*, *supra*, the Ninth Circuit underscored the difference between medical malpractice, which is not actionable under the United States Constitution, and deliberate indifference, which is an Eighth Amendment violation. Particularly, a plaintiff must show that the medical providers subjectively had knowledge of a serious risk to the plaintiff, and chose to disregard that risk. In *Toguchi*, Dr. Chung had treated Inmate Keane Toguchi several times in the past before his untimely death in prison. The final time she treated him, she prescribed a course of medication that expert witnesses for the plaintiffs (Toguchi's surviving parents) opined caused a toxic level of drugs in his bloodstream, causing his death.

> The Ninth Circuit, however, rejected the plaintiffs' expert witness opinions that the treating physician, Dr. Chung, had been deliberately indifferent. To reach this result, the Court focused particularly on what Dr. Chung *knew* and *believed* before her allegedly wrongful acts or omissions. In response to an argument that Dr. Chung should have considered the prescription drug Cogentin an excessive risk to the deceased inmate's health, the Court opined: "Because she did not *believe* that Cogentin use presented a serious risk of harm to Keane, her conduct cannot constitute deliberate indifference." *Id*. at 1058 (emphasis added).

Similarly, the court noted,

> *It does not matter whether Dr. Chung's assumptions and conclusions were reasonable*. Rather, *so long as she was not subjectively aware of the risk* that Keane could be suffering from a drug overdose, and disregarded that risk, she was not deliberately indifferent. *Farmer*, 511 U.S. at 837.

*Id*. at 1060 (emphasis added).

Summary judgment for Dr. Chung thus was appropriate because she relied on her professional judgment, believed that her chosen course of treatment for the prisoner was medically appropriate, and did not have the benefit of other medical specialists' opinions recommending otherwise. Contrarily, in *Snow v. McDaniel*, 681 F.3d at 981, the Ninth Circuit Court held that summary judgment was *inappropriate* where, for three years, prison doctors had ignored the consistent recommendation by two outside specialists that the prisoner needed hip surgery to alleviate his severe pain and mobility issues.

**3. Supplemental Jurisdiction Medical Malpractice Standard of Law**

Plaintiff also brings several state law claims under the Court's supplemental jurisdiction authority. Title 28 U.S.C. § 1367 provides that a district court may exercise supplemental jurisdiction over state claims when they are "so related" to the federal claims "that they form part of the same case or controversy under Article III of the United States Constitution." In other words, the supplemental jurisdiction power extends to all state and federal claims which one would ordinarily expect to be tried in one judicial proceeding. *See Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 563-64 (1st Cir. 1997).

The elements of a medical malpractice claim are set forth in pertinent part of Idaho Code § 6-1012:

> In any case, claim or action for damages due to injury to or death of
> any person, brought against any physician and surgeon or other
> provider of health care . . . such claimant or plaintiff must, as an
> essential part of his or her case in chief, affirmatively prove by direct

> expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided.

The elements of a state-law negligence action are the following: "'(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage.'" *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011) (quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)).

With the foregoing legal standards in mind, the Court now reviews Defendants' pending motions for summary judgment and Plaintiff's requests for the actual x-ray films and other medical records.

### 4. Background

At the time of the incidents complained of, Plaintiff was an Idaho state prisoner in his mid-to late-fifties. In July 2011, he suffered a serious neck injury, when he tried to lift a fallen tree while working at an Idaho Department of Correction/Forest Service work camp for inmates. On July 18, 2012, Plaintiff had an MRI of the cervical spine that showed multilevel degenerative changes, worse at C6-7 and C5-6, where there was mild-to-moderate foraminal stenosis and spinal cord compression. (Dkt. 23-4, pp. 1-2.)

On December 21, 2012, Plaintiff was referred to an outside neurosurgeon, Dr. Kenneth Little, "for a consultation regarding a chief complaint of right arm pain." (Dkt. 23-4, p. 1.) Plaintiff reported pain, numbness, and weakness in his right arm and hand. He

also tested positive for neck pain. (*Id*.) Dr. Little recommended surgery as the most effective treatment. Before performing the surgery, Dr. Little made sure that Plaintiff was aware of "the expected and potential outcomes *including the possibility that his neck pain may not improve*, his arm pain will not improve, pseudoarthrosis [movement of bone at the location of a fracture due to inadequate healing], and adjacent segment failure." (*Id*. p. 3 (emphasis added).)

On March 4, 2013, Plaintiff had neck surgery, a C5-C6 and C6-C7 anterior cervical disk fusion with a bone graft. (Dkt. 23-4, p. 4.) On March 22, 2013, Plaintiff saw Dr. Little for a follow up. (*Id.,* p. 11.) He reported doing very well, although he had some stiffness in his neck. Plaintiff was taking Norco and Neurontin as needed. Dr. Little planned to see Plaintiff four weeks after x-rays. (*Id*.)

On July 23, 2013, Plaintiff had cervical spine x-rays, which showed that the disc spaces were fused and the vertebral body alignment was normal. (Dkt. 23-4, p. 12.) Radiologist Dr. Jacob Cambier concluded it was a "successful appearing post-op" cervical spine exam. (*Id*.)

On August 15, 2013, Plaintiff had another follow-up appointment with Dr. Little. (Dkt. 23-4, p. 13.) Plaintiff reported he was doing well and no longer had any radicular arm symptoms. He had some persistent posterior cervical pain that he described as a burning discomfort that was worse if he flexed his neck. He was still having headaches. Dr. Little specifically noted in his medical report that the imaging studies consisted of a "[c]ervical spine x-ray on July 23, 2013, *which was reviewed on hard films*" (emphasis

added)." (*Id*.) Dr. Little concluded that Plaintiff had "good cervical spine alignment, good hardware position," that he had "resolution of his radicular symptoms," that he should "follow up with a physician's assistant in three months with x-rays of the cervical spine," but that he could follow up sooner if he experienced "any increasing issues." (*Id*.)

On August 28, 2013, Plaintiff saw Dr. Savala at the prison and complained that the back of his neck felt hot and he was getting headaches. (Dkt. 23-4 p. 14.) He reported that Dr. Little told him to take Ibuprofen, but he wanted to take Naproxen. Plaintiff flexed and extended his neck without complaints of pain. Dr. Savala prescribed Naproxen and recommended an appointment with Dr. Little. (*Id*.) On September 7, 2013, Regional Medical Director Dr. Murray Young approved the request. (Dkt. 23-4, p. 15.)

On September 16, 2013, Plaintiff had cervical spine x-rays in preparation for his follow-up examination at Dr. Little's office. (Dkt. 23-4, p. 16.)

In October 2013, Plaintiff felt his neck "snap."

On November 12, 2013, Plaintiff saw Dr. Little's Physician's Assistant (PA) Nicole Amideo. Plaintiff reported that he was doing well, but had the following symptoms: "cervical pain that he sometimes feels catches" but that decreases when he changes positions, headaches in the posterior neck when he looks down, and numbness and tingling in both arms (right worse than left). He was no longer having radicular pain. (*Id*., p. 17.) PA Amideo wrote: "*Cervical spine x-rays from September 16, 2013 were reviewed today*. They showed *stable cervical alignment and good position of hardware*." (*Id*. (emphasis added).)

PA Amideo recommended as follows:

> I did reassure the patient that his neck pain and headaches are intermittent. They are decreased with range of motion. At this time, I would like for the patient to see how he is doing at a year out. If he continues to have these symptoms, evaluate for a possible CT myelogram at that time would be recommended.

(Dkt. 23-4, p. 18.) The letter was sent to the prison medical unit.

On December 11, 2013, Plaintiff requested a medical evaluation, citing "my neck after surgery" as the complaint at issue. (Dkt. 23-4, p. 19.) On December 30, 2013, at the evaluation appointment with NP Poulson, Plaintiff reported that doing beadwork and leatherwork caused him to have a posterior headache and tension, and that his headache was relieved by movement. Plaintiff also reported popping since the surgery, but it was not associated with any symptom. (*Id.*, p. 22.) NP Poulson reviewed the neurosurgeon office's report and noted that the x-rays showed stable cervical alignment and hardware. NP Poulson prescribed a trial dosage of Parafon Forte and on-site physical therapy. Plaintiff was encouraged to do "frequent ROM during activities to decrease symptoms." (*Id.*)

In January 2014, Plaintiff complained that his neck was sore all the time. On January 22, 2014, NP Poulson examined Plaintiff. NP Poulson did a detailed analysis on why he did not believe a re-evaluation at the surgeon's office was warranted: (1) Plaintiff currently complained that his symptoms began in October 2013, when he "began having "popping' sensations in his neck"; (2) Plaintiff saw Dr. Little's PA for evaluation one month later, in November 2013; (3) Dr. Little's PA concluded that Plaintiff should be

seen for further testing and evaluation one year post-op if his "<u>radicular</u>" symptoms continued (NP Poulson underlined "radicular" in the record); and (4) Plaintiff's radicular symptoms had resolved. Poulson ordered a new x-ray and asked Plaintiff to submit an HSR in February for the one-year follow-up. (Dkt. 23-4, p. 23.)

On January 24, 2014, an x-ray was done and a report was prepared by radiologist Dr. Roger Blair. The history on the report showed that Dr. Blair was specifically assessing the x-rays for Plaintiff's particular complaints: "Evaluate fusion C5 to C7. Felt pop in October and since has been having headache and grinding feeling with rotation." (Dkt. 23-4, p. 24.) He compared Plaintiff's x-ray from September 2013, and noted "acute angulation of C5 with respect to C6," but that did not appear to be a change. He found "no instability of extension or flexion, and no overall change since September." (Dkt. 23-4, p. 24.)

On January 28, 2014, Plaintiff had an appointment with NP Schaffer at the prison. Plaintiff complained that he developed a headache when he carried 25 to 30 pounds of garbage, and that he had neck soreness all the time. (Dkt. 23-4, p. 25.) NP Schaffer noted in the record that Plaintiff reported no radicular symptoms. NP Schaffer diagnosed him with muscle spasms and prescribed trigger point injections. (Dkt. 23-3, p. 10.) NP Schaffer continued the same diagnosis through the February 10, 2014 visit. (Dkt. 23-4, p. 26.) Plaintiff disagreed with NP Schaffer's assessment of muscle spasms, because it did not feel like a spasm, and asked for a second opinion. (*Id*.)

On February 27, 2014. Defendant Dr. Murray Young examined Plaintiff, noted he had a mild amount of stiffness on flexion and extension of his neck, but found Plaintiff was neurovascular intact. Based on the examination, Dr. Young opined that there were no indications Plaintiff's prior surgery had failed or that he urgently needed to see a neurosurgeon. (Dkt. 23-3, Decl. Dr. Young, p. 10.) Much like Dr. Little's original cautions to Plaintiff before surgery, Dr. Young explained to Plaintiff "that he would probably never be pain free but that Tylenol or Advil will work for him since he is a post-surgical patient." (Dkt. 23-4, p. 27.)

Plaintiffs' pain continued. On April 1, 2014, Defendant Poulson examined Plaintiff, and submitted a request for Plaintiff to see Dr. Montalbano, a neurosurgeon, for an evaluation. (Dkt. 23-4, p. 28.) On April 2, 2014, Dr. Young denied the request because, in his medical opinion, the x-rays had shown normal healing and no evidence of instability, and Plaintiff's pain was not continuous, but went away if he changed positions. Dr. Young wanted additional x-rays done to ensure the hardware had not failed. Dr. Young set up an alternative treatment plan. (Dkt. 23-3; Dkt. 23-4, p. 29.)

On May 22, 2014, PA Williamson prescribed two weeks of TENS therapy for Plaintiff. (Dkt. 23-3, pp. 11-12; Dkt. 23-4, p. 30.)

On May 28, 2014, Plaintiff had another x-ray. The x-rays—read and reported by a radiologist—showed no change in alignment, no acute abnormality, no evidence of instability, unremarkable nonsurgical discs, no acute or chronic feature, and no significant change since January 2014. (Dkt. 23-4, p. 32.)

November 2014 marked the one-year mark to reassess Plaintiff's headache and neck pain issues if radicular problems continued, according to PA Amideo of Dr. Little's office. At that time, Plaintiff did not have radicular symptoms but had intermittent neck pain, headaches when doing certain activities, and a sensation of popping.

On January 14, 2015, Plaintiff's request to see Dr. Montalbano was granted, but his request for an MRI was denied. Dr. Young first wanted Plaintiff to see Dr. Montalbano and receive his recommendations before proceeding with an MRI. (Dkt. 23-3, pp. 12-13; Dkt. 23-4, p. 35.)

On February 10, 2015. Plaintiff had another set of x-rays that were read by radiologist Dr. Roger Blair, who concluded: "Anterior fusion C5 to C7 with no significant change since May 2014. There is no obvious instability noted." (Dkt. 23-4, p. 36.)

On February 11, 2015, Plaintiff saw Dr. Montalbano. Plaintiff asserts that Dr. Montalbano pointed to an x-ray film and said, "Who did that to you?" Dr. Montalbano recommended a CT scan to assess the previous fusion. (Dkt. 24-4, pp. 37-38.) Dr. Young approved the CT scan. (*Id*., p. 39.)

On March 5, 2015, Plaintiff had the CT scan. Dr. Jeffrey Puglsey interpreted the CT scan, observing that it showed the "fixation pate, screws, and interbody spacers [were] in expected positions"; there was "solid bone graft bridging C5-6"; but there was "no definite complete bony bridging at C6-7," a finding "that could be compatible with pseudoarthrosis in the appropriate clinical setting." (Dkt. 23-4, pp. 41-42)

*Not noted on the CT report*, but included in Dr. Montalbano's report were observations by Dr. Montalbano that the screws at the C-5 area "project from a rostrocaudal direction"; that Plaintiff *is* suffering from pseudoarthritis at C6-C7; and that there is an "anterior middle column fracture at the level of C5 with associated kyphotic deformity." (*Id.*, p. 43.) Dr. Montalbano recommended a second surgery, to be extended to C4-C5, due to the C5 fracture. (*Id.*) That surgery was approved by Dr. David Agler. (Dkt. 23-3, pp. 14-15; Dkt. 23-4, p. 44.)

In April 2015, Dr. Montalbano recommended an MRI prior to surgery. The MRI was approved; Plaintiff had the MRI in May 2015. (Dkt. 23-4, pp. 45-46.)

On May 1, 2015, Plaintiff submitted a Health Services Request form, stating, "My neck is hurting worse, it sounded like it is grinding something, can't sleep." (Dkt. 23-4, p. 47.) The response to the HSR was as follows:

> Patient was assessed in sick call to have his pain documented. Educated patient that even though he didn't want to be forwarded to providers that I have to at least present this to them and they will decide to schedule or note. Patient verbally demonstrated understanding.

(Dkt. 23-4, p. 47.) Plaintiff was given an ice memo for three days. He declined pain medication. (*Id.*)

On May 13, 2015, Plaintiff had the MRI. (Dkt. 23-4, p. 48.) On May 27, 2015, NP Gelok met with Plaintiff to discuss the MRI. (*Id.* at 50.) NP Gelok noted that Plaintiff had a follow-up with Dr. Montalbano, and that he would fax the MRI results to Dr.

Montalbano for review and recommendations. Plaintiff had several questions, and NP Gelok told Plaintiff he would pose those questions to the specialist, Dr. Montalbano. (*Id*.)

On September 3, 2015, Plaintiff saw NP Gelok in the Chronic Care Clinic for reasons other than his neck symptoms. However, it was noted that Plaintiff reported walking four to five miles per day and felt he was at a baseline state of health. (Dkt. 23-5, p. 1.)

On September 23, 2015, Plaintiff had x-rays again, and Dr. Cambier noted on the x-ray report that there was no instability and no noteworthy interval changes when compared to the February 2015 x-ray. (Dkt. 23-5, p. 2.) On September 24, 2015, Dr. Montalbano performed the C5-7 anterior cervical fusion surgery.

### 5.      Analysis

After considering the entire record, the Court concludes there is no genuine dispute as to any material fact regarding the medical care Plaintiff received from Defendants Dr. Murray Young and Nurse Practitioner (NP) William Poulson. Plaintiff has not presented expert testimony evidence to support his state-law medical negligence claims, even though he has been seen by a variety of doctors who could supply that opinion. Plaintiff's federal and state claims fail for lack of sufficient evidence to reach a jury, and Defendants are entitled to summary judgment.

### A. *Discovery and Subpoena Motions*

As a preliminary matter, the Court considers Plaintiff's complaints that Defendants have not provided him with enough discovery items, and that he should be

entitled to obtain by subpoena duces tecum—at public expense—copies of the x-ray films and other test results. Dkts. 20, 25. Plaintiff asserts both (1) that a layperson could see that the initial post-surgery x-rays showed that the first surgery was "botched," and (2) that an independent expert is needed to compare all of the x-rays and images. See Dkt. 22. Therefore, Plaintiff has filed a Motion for Issuance of a Subpoena duces Tecum with Service. Dkt. 20.

Defendants assert that Plaintiff's motions should be denied because he can view copies of the x-rays and MRI at the prison by contacting the Health Services Administrator, that making copies is cost-prohibitive, that Plaintiff cannot keep such copies in his cell due to prison security regulations, that Plaintiff has no medical expertise to read the x-rays and MRIs, and that Plaintiff has been provided with copies of the radiology reports showing an expert's reading and analysis of the reports.

Congress has not appropriated any funds for indigents to obtain items related to discovery in civil rights litigation. *See Tedder v. Odel*, 890 F.2d 210 (9th Cir. 1989.) The Court may use non-appropriated funds for costs of litigation for indigents. *See Giraldes v. Prebula*, 2012 WL 1355739, at *2 (E.D. Ca. April 18, 2012). Because the funds are limited, the Court permits their use when good cause is shown.

The Court has considered whether the lack of an expert is simply due to an unequal playing field, and has determined that it is not. Plaintiff's medical records show that he has seen several experts as treating physicians—any of whom Plaintiff could have relied upon to show a different standard of care.

Plaintiff acknowledges that Defendants have sent him 3,807 pages of medical records. Dkt. 30, page 3. Plaintiff has all of the relevant x-ray and test reports, documentation of all of the medical care he received at the prison, and all of the specialists' reports and recommendations. Dkt. 23-4 and 23-5.

The Court finds and concludes that the items Plaintiff desires in his discovery and subpoena motions would not make a difference in the Court's decision, nor would searching for experts to give differing opinions than the specialists or prison doctors in this case, because the case turns on the subjective knowledge and intent of Defendants. Therefore, the motions will be denied. The Court assumes for the purpose of considering the Motion for Summary Judgment that what Plaintiff alleges as to the discovery requested is true—that the initial x-rays showed an error in rod installation that demanded emergency corrective surgery.

### B. *Medical Decision-Making of Defendants*

Both Defendants gave Plaintiff continuous and progressively more aggressive treatment as Plaintiff complained of complications from a prior surgery. Dr. Young and NP Poulson relied on x-ray "results"—which they clarify meant the x-ray reports prepared by radiologists and not the x-ray films themselves—to make their diagnoses and decide on an appropriate course of treatment. The x-ray reports did not mention that a problem with Plaintiff's hardware had developed, but, instead, showed that the prior surgery had been successful.

Plaintiff argues that "results" mean x-ray *films* and not x-ray *reports*, and he deduces—without support—either that Defendants were negligent in not looking at or not properly reading the films, or that they were deliberately indifferent by not looking at or not properly reading the films. Plaintiff has nothing to support his speculation that, when medical professionals say x-ray "results," they particularly mean "films," rather than "reports." Defendants, who are medical professionals declare that the standard in the field is for medical personnel to rely on *expert radiologists* to interpret the x-rays, rather than trying to interpret the x-rays themselves. In addition, Dr. Little and his Physician's Assistant—medical specialists in this matter—both carefully documented in their records when they were reviewing actual x-ray films.

As noted above, the Court will not compel Defendants or taxpayers to provide Plaintiff with expensive x-ray films. Even if the films clearly showed the new hardware problem that had developed and was causing Plaintiff pain since his prior surgery, that is irrelevant to the particular issue at hand, because no evidence shows Defendants may have looked at the x-rays. Merely arguing about the word "results" is not evidence and does not raise a genuine dispute.

Importantly, Plaintiff has provided no expert opinion to show that the hardware issue that was identified by Dr. Montalbano but not mentioned on the CT scan by the radiologist is the primary factor causing Plaintiff's neck grinding and pain, rather than the other spinal issues noted by the experts, that eventually were addressed in the second

surgery. And, even these high-level medical experts disagreed in their interpretation of the CT scan, or at least emphasized different factors, as they analyzed the CT scan.

### C. State Law Claims

Plaintiff's state law claim is missing support from a medical expert to show that "results" mean "films," and that medical professionals regularly review the x-ray films rather than rely on radiologist reports. Plaintiff's record also lacks a showing to meet the element of causation.

### D. Eighth Amendment Deliberate Indifference Claims

As to the Eighth Amendment claim, the Court concludes that Plaintiff has not come forward with evidence showing a genuine dispute as to whether Defendants were deliberately indifferent when they followed the industry standard and looked only at the x-ray reports. It appears that the expert radiologists and the first expert neurology team appear to have missed the newly developed hardware problem over and over again on the actual x-ray. The medical records clearly show that Defendants appropriately and necessarily relied heavily on the expert specialists, and that they carefully and analytically prescribed courses of treatment for Plaintiff according to the specialists' determinations and Defendants' own medical expertise—but not in a manner that contravened clear specialists' recommendations. The Court contrasts Defendants' actions with those of the defendants in *Snow*, who chose to continuously ignore specialists' recommendations for hip replacement surgery for the prisoner.

Importantly, as noted above, two specialists seem to have differing viewpoints as to what was causing Plaintiff's pain. The radiologist found several problematic features from the CT scan, but Dr. Montalbano pointed to features that the expert who read the CT scan did not include in the CT scan report. Therefore, the record reflects that even the expert neurosurgeon and radiologist did not agree what the CT scan showed.

The record does not reflect any "deliberate indifference" of the prison medical providers. Defendants' decisionmaking is more like Dr. Chung's in the *Toguchi* case. The standard of law of deliberate indifference is extremely high and requires the jury to find a subjective component to the Defendants' behavior. Nothing in the record reflects that Defendants ignored Plaintiff's symptoms, especially given their repeated decisions to change the course of treatment to try to address Plaintiff's problems.

The record is full of evaluations and observations from the expert specialists that show why Defendants thought and decided as they did. The original neurosurgeon, Dr. Little, noted that Plaintiff was being seen for a primary concern of radiculopathy. Dr. Little indicated from the start that Plaintiff's pain may never go away, even after surgery, was possible. Plaintiff's neck "snapped" in October 2013, but the specialist PA at Dr. Little's office recommended that Plaintiff be patient and wait a year to see how his continuing issues resolved. The radiculopathy—which, again, had been Plaintiff's primary symptom—resolved after the first surgery.

On May 1, 2015, Plaintiff actually requested that he *not* be provided with additional care. This may have been a tactic to give him an edge in litigation; or he may

have just been fed up with trying to obtain a solution to his longstanding pain that day, a normal human reaction. Regardless, during this time period, no deliberate indifference of medical personnel is evident from the record. NP Gelok was forwarding MRI results and all of Plaintiff's questions to neurosurgeon Dr. Montalbano.

In due course, the second surgery was performed. Surgery evaluation and performance take a long time in the outside world, due to health insurance companies' specific rules and often limited coverage for procedures. Prison is not, and should not be, different. Taxpayer funds are used for all prison health care, and the providers owe a duty to prisoners and, to a lesser extent, to the taxpayers to use conservative treatment when practical, and to carefully commit resources to more expensive procedures where necessary and where conservative treatments have failed. Surgeries have their own inherent risks that can be avoided through conservative treatments. Surgeries also often have lengthy healing periods which can vary according to the individual. Taxpayers themselves are subjected to this same course of required trial-by-error treatment and required approvals by insurance companies.

Plaintiff has not come forward with evidence supporting a subjective deliberate indifference component to Defendants' choices of treatment for Plaintiff, especially given the amount and diversity of care given him between his first and second surgeries. Even if Defendants were negligent, that is not enough to support an Eighth Amendment claim, and, as discussed above, Plaintiff has not submitted sufficient evidence even to meet a state-law medical negligence standard to show that Defendants were negligent.

### 6. Conclusion

Plaintiff fails on essential elements of both his state law and constitutional claims. Plaintiff has had sufficient access to medical records, medical reports, and expert treating doctor opinions. Accordingly, Plaintiff's claims will be dismissed with prejudice, and judgment will be entered for Defendants.

### ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Dkt. 23) is GRANTED.

2. Plaintiff's Motion to Compel (Dkt. 25) is DENIED.

3. Plaintiff's Motion for Issuance of Subpoena Duces Tecum (Dkt. 20) is DENIED.

4. Plaintiff's case in its entirety is DISMISSED with prejudice.

DATED: March 29, 2018

David C. Nye
U.S. District Court Judge